STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
|---|---|---|
| In re: Appeal of JAM Golf, LLC | } | Docket No. 69-3-02 Vtec |
|  | } |  |
|  | } |  |

Decision and Order

Appellant-Applicant JAM Golf, LLC (Applicant) appealed from a decision of the Development Review Board (DRB) of the City of South Burlington regarding a proposed ten-lot subdivision. Applicant is now represented by William A. Fead, Esq.; the City of South Burlington is represented by Amanda Lafferty, Esq.; Interested Persons James Marc Leas, Marie Ambusk, William Rozich, Elizabeth Rozich, John Kane, Michael Provost, and Heather Provost have appeared and represent themselves. Only Applicant and the City submitted supplemental memoranda on the issues remaining after remand from the Vermont Supreme Court.

This Court issued a Decision and Order in June 2006, denying the application on the basis that the proposed project does not meet the requirements of two of the criteria for a Planned Residential Development (PRD). See South Burlington Zoning Regulations § 26.151.[1] On appeal, the Vermont Supreme Court reversed the denial, holding that both of the criteria addressed in the 2006 Environmental Court decision were unenforceable, and remanded for this Court to issue a decision under the remaining sections of the zoning regulations at issue in this appeal. In re Appeal of JAM Golf, LLC, 2008 VT 110.

---

[1] All citations to section numbers refer to sections of the South Burlington Zoning Regulations, as last amended April 23, 2002, unless otherwise specifically noted.

1

Ten days of evidentiary hearing had been held in this matter before Merideth Wright, Environmental Judge. A site visit was taken in advance of the hearing with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings; they were also given an opportunity to submit supplemental memoranda and requests for findings directed to the proceedings after remand. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows. Some findings in this decision are reiterated as necessary from the 2006 decision, to avoid any need for cross-referencing the earlier decision

The parties stipulated that only subsections (h) and (i) of § 26.151 remained at issue in this appeal. This Court issued a Decision and Order on June 12, 2009, determining that § 26.151(i) is unenforceable and would not be further considered. That decision determined that § 26.151(h) is not too vague to be enforceable, because it uses identical language to the corresponding criterion in Act 250, and because the so-called Quechee test used in Act 250 provides standards which can be applied to determine whether a proposed project will have an "undue adverse effect on the scenic or natural beauty of the area" and whether it is "aesthetically compatible with surrounding developed properties."

Highlands Development Company and Applicant JAM Golf, LLC, both owned by James A. McDonald, are the successor owners and developers of a 450-acre planned residential development known as the Vermont National Country Club (VNCC), in the Southeast Quadrant zoning district of the City of South Burlington. The VNCC development consists of an 18-hole golf course, with its associated clubhouse and other facilities, and 296 residential housing units, some developed as town houses and some as single-family homes. Highlands owns the portions of the VNCC permitted for residential development; Applicant owns the portions of the property used for the golf

2

course.  At the time of the application, R & L Taft Building, Inc. proposed to purchase the parcel proposed for the subdivision at issue in the present appeal if permits are issued for it; therefore, some of the evidence has referred to this project as "the Taft subdivision."

The area at issue in the present application is an area of woodland occupying a wooded knoll located to the east of Golf Course Road, six to seven acres in area, bounded by the fairways for holes 11, 13 and 14.  It is on a ridge or height of land between Dorset Street and the eastern edge of the Butler Farm development, and contains particularly mature and tall trees.  It is a distinct wooded feature in the landscape, and appears in the skyline of the easterly half of the VNCC property.

The project property was woodland when the surrounding area, now developed as VNCC, was primarily farmland.  The existing woodland associated with the project proposal is roughly in the shape of a left-handed mitten, with the 'thumb' extending between the 14th hole fairway and the 13th hole green.  It is a mature woodland, containing a mix of evergreens and deciduous trees, including mature hickory, butternut, beech, oak, hophornbeam, black cherry, and pine.  The wooded knoll descends most steeply to a lower elevation on proposed lots 4, 3 and 10, while the remaining lots contain more gentle slopes.  The project woodland also has an undergrowth of dense shrubs and young saplings.  The "thumb" section of the woodland contains shrubs and tall pine trees, although it has become thin in places due to the loss of some tall pines in an ice storm several years before the application.

A second densely wooded area (the East Woodland), containing both deciduous and evergreen trees, is located on gentler slopes to the east of the 13th hole; it is not proposed for any development in this application.

In the present application, Applicant has applied for preliminary subdivision approval and site plan approval of a ten-lot, single-family residential subdivision to be served by a road to a cul-de-sac in the center of the wooded knoll, with a private drive

3

extension to serve lots 4, 5 and 6 (the three most northerly lots). The lot lines for all ten lots do not extend to the edges of the project property; that is, Applicant proposes to retain the land at the outside edges of the project property. Applicant has performed a thorough survey of the existing trees in the project area, and has identified their individual species, sizes, and condition.

Exhibits 21 and 45 through 49, together with the listing in Exhibit 53, show the trees to be retained, the trees to be removed, and the planting plan for new trees and shrubs. Exhibit 81 shows the overall area of existing trees and shrubs, and larger tree canopy, to be retained, as well as showing the overall area of new trees and shrubs to be naturalized. As shown on Exhibit 53, approximately 231 trees will be removed in connection with the proposal, while a total of 541 trees will be retained: 283 trees on the proposed lots and 258 trees on the retained land beyond the lot boundaries. In addition, approximately 233 trees and 151 shrubs are scheduled to be planted in connection with this proposal, mostly on the periphery of the house lots and in the area of woodland extending to the east of Lot 9.

Access to the proposed development from Golf Course Road is by a roadway to run on land of Applicant between two existing lots (170 Golf Course Road (Lot #86) and 194 Golf Course Road (Lot #87). The house sites on proposed Lot 1 and Lot 7 of the development will be visible from Golf Course Road and from the existing adjacent lots on Golf Course Road, each with a backdrop of the woodland that is proposed to remain. New plantings are proposed that will eventually grow up, but even when mature they will only partially screen the house sites on Lots 1 and 7.

The easterly "thumb" portion of the project woodland is proposed to remain as retained land, and is proposed to be planted primarily with evergreens and some deciduous species to fill out the area damaged by the ice storm as the trees mature. Southerly and easterly of proposed Lots 8, and 9, and easterly of proposed Lots 10, 4, 5, and 6, a wide band of woodland will remain within Applicant's control between those

4

lots and the open space of the 13th and 14th holes of the golf course. Northerly of Lot 6, a wide band of woodland will remain within Applicant's control. Westerly of Lots 1 and 2, a band of woodland will remain within Applicant's control. Westerly of Lots 3, 5, and 6, however, the land that will remain within Applicant's control is proposed to be planted with trees and shrubs but is not at present heavily wooded. Beyond the woodland of the project property, views are open towards the west, over other residential developments towards Lake Champlain.

Within the proposed lots, each house site is shown as being located within woodland that is proposed to remain. See Exhs. 21 and 45. The house sites have been placed so as to minimize the number of healthy trees that will have to be removed. However, it is expected that during development of the lots some field adjustments will have to be made, although Applicant's arborist testified that such adjustments could result in saving trees shown on the plan as intended for removal, as well as the possibility of having to remove trees scheduled for retention. For this reason, Applicant's Exhibit 51 proposes that a consulting arborist must work with the contractor during construction and that certain work such as pruning be performed by a qualified arborist. Provision should be made for the City to be notified about any field changes from the approved tree preservation plan before they are carried out.

Applicant proposes to restrict the lot owners' clearing of trees within the lots, although the enforcement of such limitations may be difficult given the potential for views to be achieved if more of the trees were cut. Beyond the proposed lots, on land to be retained by Applicant, Applicant proposes only to cut dead or diseased trees as necessary to prevent hazardous conditions.

Applicant proposes that the lot owners will be restricted to only "hand pruning" the wooded areas on their property, but that term is not defined. Exhibit 51 only defines the respective responsibilities of the project's consulting arborist and the contractor during construction. Based on the testimony of the project's arborist at trial,

5

a similar handbook defining the allowed scope of removal of material in the wooded areas must be prepared, so that compliance with it can be made a condition binding on the lot owners. A copy of the portion of the tree retention and planting plan pertaining to each lot, clearly showing the cutting limits and boundaries of each lot, must also be prepared to accompany the handbook for each lot, to allow future enforcement of the tree retention and cutting limits with respect to the lot purchasers. This is particularly important so that any purchasers or prospective purchasers will understand that the lots must remain wooded or become more wooded, and that they will not have the option of clearing the lots to open up any views beyond what is allowed by the planting plan.

With the addition of lot specific handbooks to become binding on the individual lot owners, Applicant's tree preservation and planting plan provides an excellent level of mitigation of the impact from the proposed clearing of trees for the project.

Section 26.151(h)

The Quechee test is a two-part analysis to determine if a proposed project has an "undue adverse effect on the scenic or natural beauty of the area," the identical consideration of the first clause of § 26.151(h). See In re Quechee Lakes Corp., Permit Nos. 3W0411-EB & 3W0439-EB, Findings of Fact, Concl. of Law & Order, at 17–20 (Vt. Envtl. Bd. Nov. 4, 1985).

Adverse effect/aesthetic compatibility with surrounding developed properties

The first determination is whether the proposed project will have any adverse effect, made by analyzing whether it will be "in harmony with its surroundings." This consideration includes the project's harmony or aesthetic compatibility with surrounding developed properties. § 26.151(h) (second clause). This determination is based on the following factors:

6

1) What is the nature of the project's surroundings?  Is the project to be located in an urban, suburban, village, rural or recreational resort area?  What land uses presently exist?  What is the topography like?  What structures exist in the area?  What vegetation is prevalent? Does the area have particular scenic values?

2) Is the project's design compatible with its surroundings?  Is the architectural style of the buildings compatible with other buildings in the area?  Is the scale of the project appropriate to its surroundings?  Is the mass of structures proposed for the site consistent with land use and density patterns in the vicinity?

3) Are the colors and materials selected for the project suitable for the context within which the project will be located?

4) Where can the project be seen from?  Will the project be in the viewer's foreground, middleground or background?  Is the viewer likely to be stationary so that the view is of long duration, or will the viewer be moving quickly by the site so that the length of view is short?

5) What is the project's impact on open space in the area?  Will it maintain existing open areas, or will it contribute to a loss of open space?

In re Quechee Lakes Corp., Permit Nos. 3W0411-EB & 3W0439-EB, Findings of Fact, Concl. of Law & Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985).

As determined in the 2006 decision, the proposed project will thin the trees in the area of the roadway and the house sites so that the woodland feature will be reduced in importance as a natural feature in the landscape.  This is an adverse effect on the scenic appearance of the woodland as a natural feature in the landscape.

The proposed project will also have an adverse effect on the view of the woodland from neighboring properties and from persons walking along Golf Course Drive in the area of Lots 7 and 1, as those houses will be visible where there is now a view of the intact woodland.

In the longer term, the trees to be planted in connection with the proposed project will have a positive effect on the view of or appearance of the "thumb" of woodland damaged by the ice storm.

The developed properties surrounding the proposed project are residential lots in an open, suburban, golf course setting. After construction, the project will have the appearance of residences in a wooded setting, similar to other developments in the Southeast Quadrant. The house sites will be partially screened from view from the exterior of the development; the screening effect will increase as the proposed plantings mature. With the limitations on additional street lighting and the shielding of exterior lighting requested by the City in its proposed conditions 6 and 7, the proposed project will be is aesthetically compatible with surrounding developed properties, satisfying the second clause of § 26.151(h).

Whether any adverse effect is undue

If a proposed project will have any adverse effect, the second step in the inquiry is to determine whether the adverse effect is "undue," by analyzing the following three questions. If any of the three questions is answered affirmatively, the effect is considered "undue."

1) Does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area? . . .

2) Does the project offend the sensibilities of the average person? . . . It is not enough that we might prefer to see a different design or style of building, or that we might prefer a different type of land use, but that the project, when viewed as a whole, is offensive or shocking, because it is out of character with its surroundings, or significantly diminishes the scenic qualities of the area.

3) Has the Applicant failed to take generally available mitigating steps which a reasonable person would take to improve the harmony of the proposed project with its surroundings? . . .

In re Quechee Lakes Corp., Permit Nos. 3W0411-EB & 3W0439-EB, Findings of Fact, Concl. of Law & Order, at 19–20 (Vt. Envtl. Bd. Nov. 4, 1985).

The proposed project does not violate a clear written community standard intended to preserve the aesthetics or scenic beauty of the area. As determined by the Vermont Supreme Court, the elements of the municipal plan that might have preserved this wooded knoll as an important natural scenic feature in the landscape (or as necessary to wildlife connectivity) are not enforceable. In re Appeal of JAM Golf, LLC, 2008 VT 110, ¶¶ 18–19. The City has not pointed to any other sufficiently specific element of the municipal plan that allows preservation of this woodland on the basis of its aesthetics or scenic beauty.

No evidence was presented to suggest that the proposed project offends the sensibilities of the average person. The project's appearance is characteristic of residences in a wooded setting, partially screened from view from the exterior of the development. Even Lots 7 and 1 will have the appearance of houses set against a wooded background, until the additional plantings mature. While some of the nearby and adjoining landowners would reasonably prefer not to see another house where they now see trees, the appearance of the project will be consistent with that of the surrounding residential development in the area, and will be better screened from its neighbors than are many of the other residences built in the more open areas of the surrounding golf course.

Applicant has taken generally available mitigating steps to improve the harmony of the project with its surroundings. The project proposes to retain as many of the trees as possible on the project property, in particular on and near the height of land and on the perimeter of the project, proposes to plant a large number of trees and shrubs, largely on the perimeter of the project, and proposes to preclude the cutting of trees on project lots adjacent to the perimeter of the project.

9

As none of the three criteria for determining that an adverse effect is "undue" has been met, the proposed project will not have an "undue adverse effect on the scenic or natural beauty of the area."

Modifications of Area and Dimensional Requirements

Applicant's supplemental brief also requests the Court to approve four modifications to the area and dimensional requirements that otherwise would be applicable. These modifications are allowed in connection with the approval of a PRD, and are not opposed by the City. The modifications requested are a reduction in lot frontage for Lot 3, a reduction in the width of the street and private roadway, and a reduction in the length of the sidewalk. The requested modifications will enable Applicant to cut fewer large trees than otherwise would occur, and will allow the full extent of tree preservation proposed in this application. The requested modifications are approved for that reason.

Accordingly, with the following additional conditions, it is HEREBY ORDERED and ADJUDGED that the proposed project meets § 26.151(h) and that preliminary plat approval of the project is therefore GRANTED.

- Applicant shall provide a tree preservation handbook required to be followed by the lot owners, including definitions of all allowed activity on the lots and in the area of the project property beyond the lots, together with a copy of the segment of the planting plan pertinent to each lot owner's lot and to the area of project property within the viewshed of that lot.

- Applicant shall provide the City with an annual certification from a qualified consulting arborist as to compliance with the tree retention plan

10

and the planting plan, on the lot owners' lots as well as on the retained property, specifically listing any areas of noncompliance.

- No additional street lighting may be installed without an amendment to this approval.
- All lights on the exterior of any building shall be downcast, shielded fixtures.

Applicant and the City shall prepare an agreed judgment order approved as to form, or, if they cannot agree, may each prepare a proposed judgment order on or before September 4, 2009. The proposed judgment order shall provide for the additional conditions, and for the four modifications of area and dimensional requirements, discussed in this decision.

Done at Berlin, Vermont, this 21st day of August, 2009.

_____

Merideth Wright
Environmental Judge